**E-FILED**
Friday, 13 November, 2009  01:56:02 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FLAGSTAR BANK, FSB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-1278 |
| | ) | |
| FREESTAR BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is now before the court on cross Motions for Summary Judgment as well as two *Daubert* Motions to Strike expert testimony.  For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment on the "Likelihood of Confusion" Question [#38] is DENIED.  Defendant's Motion to Strike the Expert Report of Edward Lee Lamoureux [#49] is GRANTED. The Court finds Plaintiff's Motion to Exclude the Expert Testimony of Ronald R. Butters, PhD [#59] MOOT.  Defendant's Motion for Summary Judgment [#57] is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, as the complaint presents federal questions arising under the Lanham Act 15 U.S.C. §§ 1501, *et seq.* The Court has supplemental jurisdiction over the related state law claim pursuant to 28 U.S.C. §1367.

## FACTUAL BACKGROUND

Plaintiff, Flagstar Bank ("Flagstar"), Flagstar is a publicly traded, Michigan-based bank with 175 banking centers in Michigan, Indiana, and Georgia.  There are no Flagstar banking centers located in Illinois.

Plaintiff is the owner of the following registered trademarks (with dates of registration in parenthesis):

- U.S. Trademark Registration No. 2,015,295 (11/12/1996):



- U.S. Trademark Registration No. 2,123,471 (12/13/1997):



- U.S. Trademark Registration No. 3,188,184 (12/19/2006):



- U.S. Trademark Registration No. 3,593,602 (3/24/2009):

Flagstar offers checking and savings accounts, home mortgage loans, and money market accounts as a part of its banking services.  Prospective customers must submit to a credit check prior to opening an account with Flagstar, who bases the approval of the new account on the prospective customer's financial history. According to its 2008 Annual Report, Flagstar has incurred $12.3 million in advertising costs over the course of the year.  Registration No. 3,188,184 is the mark that Flagstar predominantly uses in commerce today. Joyce Depo. at 12.

The "legacy mark" (Registration No. 2,123,471) is Flagstar's original trademark and is still used in various parts of the organization. *Id.* at 11.

Flagstar also operates 104 home loan centers, including five within the state of Illinois. None of Flagstar's Illinois home loan centers are located in Champaign, Livingston, or McLean counties.  Flagstar's home loan centers are engaged in mortgage origination; customers are not capable of making deposits or withdrawals at the home loan centers.  The home loan centers are provided with Flagstar marketing materials and are allowed to independently decide how to utilize those materials in local advertising.

Freestar is a small community bank with 13 branches, all located within a three-county area of Central Illinois: Champaign, Livingston, and McLean. Defendant limits its advertising to that area.  Freestar began operations in 1934 as "Pontiac National Bank" and "Peoples Bank," and adopted the "Freestar Bank" name in 2006 after consulting with The Tracy Edwards Company, a private branding and marketing consulting company.  Freestar offers traditional banking services including checking and savings accounts as well as home mortgage loans.

For over three years, Freestar has used its mark in commerce.  According to Freestar's designated representative, Freestar limits its advertising to the three-county area in which it operates banking centers via local radio stations, television broadcasts, newspapers, and billboards. Vogelsinger Aff. ¶ 20. On June 23, 2006, Defendant filed Application No. 78/915,706 to register the following mark:



The parties do not dispute the identical nature of their products and services.  Both parties' banking centers offer personal and business savings accounts, personal and business checking accounts, money market accounts, certificates of deposit, home mortgage loans, home equity lines of credit, online banking and online mortgage applications.  Flagstar's home loan centers are used for mortgage origination, and customers are not able to make deposits or withdrawals at the home loan centers.

On October 15, 2008, Flagstar commenced this action against Freestar alleging trademark infringement under 15 U.S.C. § 1114 (Count One), false designation of origin, false advertising, and trade dress infringement under 15 U.S.C. § 1125 (Count Two), and Illinois state common law trademark infringement (Count Three).  Plaintiff moved for Partial Summary Judgment on the "Likelihood of Confusion" Question.  Flagstar argues that the evidence presented clearly proves that allowing competitive uses of FLAGSTAR BANK and FREESTAR BANK in the marketplace will create a likelihood of confusion. Flagstar points to the similarity of the marks, similarity of the products offered, and use of the same marketing channels directed toward a similar type of consumer to justify its position.

Freestar countered with its own Motion for Summary Judgment on all counts of Flagstar's Complaint. Freestar first claims that Flagstar lacks Constitutional standing to bring this lawsuit because it has failed to prove an actual or imminent injury giving rise to a justiciable case or controversy.  Freestar asserts that the undisputed facts, as well as the evidence on the record, present no genuine issue of fact concerning the likelihood of confusion question. This matter is fully briefed, and this order follows.

## *DAUBERT* MOTIONS

Under Federal Rule of Evidence 702, witnesses "qualified as an expert by knowledge, skill, experience, training, or education" may testify as long as "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue".  Fed. R. Evid. 702.  The court functions as a gatekeeper, allowing the admission of expert testimony only if it "rests on a reliable foundation" and is "relevant to the task at hand".  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).

Courts may consider numerous factors when determining the reliability of proposed expert testimony, including:  "whether the theory or technique… can be (and has been) tested"; whether the theory "has been subjected to peer review and publication"; the technique's "known or potential rate of error"; if the theory is generally accepted within the community; and whether the expert's "preparation is of a kind that others in the field would recognize as acceptable".  Daubert 509 U.S. at 592-594; Kuhmo 526 U.S. at 151.

### I.   Edward Lee Lamoureux

Dr. Edward Lee Lamoureux holds a Ph.D. from the University of Oregon in Rhetoric and Communication with an emphasis on conversation analysis, rhetoric, qualitative research methods, general speech, and interpersonal communication. He has been employed a professor in Bradley University's Department of Communication since 1985 and asserts that his expertise lies in the realm of "social" linguistics, as opposed to "formal" linguistics. Lamoureux Dep. at 33. Although Freestar disputes the relevancy of his qualifications, Dr. Lamoureux's educational background clearly qualifies him as an expert on "social" linguistics and rhetorical criticism.

Dr. Lamoureux has offered an expert report with two pages of analysis concerning the "Flagstar Bank" and "Freestar Bank" names.  Lamoureux asserts that "flag," "free," and "star"

are each "strongly associated with some of the most broadly shared values in American culture: Patriotism, loyalty, national identity, and individual rights". Briefly noting the "significant and overlapping metaphorical associations" of these words, Lamoureux goes on to state that "given post 9-11 emphases on patriotism and nationalism, we can expect that a substantial population of bank customers are likely to confuse" the parties' names if encountered in a common marketplace.

Freestar argues that Dr. Lamoureux's report is unreliable, not as a result of faulty methodology, but because Dr. Lamoureux employs no methodology at all. According to Dr. Lamoureux, his conclusions are based upon consultation of "classic texts" in the field of metaphorical association. The consultation of texts is acceptable if it leads to a report grounded in the accepted theory or method applicable to the field. However, as this court has stated before, "if [the expert] is unable to specify what type of methodology [he] employed in this case, it is impossible…to evaluate the propriety of that methodology". <u>Collier v Bradley</u> 113 F.Supp. 2d 1235, 1244-1245 (C.D. Il 2000).

Dr. Lamoureux has not presented any proposal, theory, or technique justifying his conclusion that customers are likely to confuse the parties' marks. Dr. Lamoureux includes no footnotes and attaches no supplements which explain the theories offered by the "classic texts" he read. He includes no reference to or discussion of the classic texts in his report. Thus, the court is left to speculate as to what the classic texts stated and how Dr. Lamoureux used those theories to reach the conclusions he articulates. Dr. Lamoureux proposes no theory which explains how one particular metaphor shared by three words becomes so dominant in customer's minds that it overcomes the many other metaphorical associations attributable to the words. Dr. Lamoureux asserts that all of these words are "God-terms," "Ideographs," and "Ultimate-terms";

however, he offers no explanation of the factors or process by which a word is evaluated and categorized as a "God-term".  Further, Dr. Lamoureux offers no explanation of why words associated under the "God-term" category move beyond the realm of distinguishable similarity and into the world of confusion. His fleeting reference to "metaphorical markers" and similar meanings sets is accompanied by no stated theoretical underpinning which would explain the significance of these labels on consumer confusion in the marketplace.

Further, Dr. Lamoureux references no polls or qualitative research supporting his statement that patriotic metaphorical associations "have become particularly 're-energized' and show an increase in both patriotic and nationalistic fervor since the events of September 11, 2001". R. 50, Ex. D: Dr. Lamoureux Expert Report. Without any references to back up this bare assertion, Dr. Lamoureux's statement is nothing more than conjecture.  Is he asserting that "re-energized" patriotic metaphors reveal an increase in patriotic fervor? Does he base his conclusive findings on personal observation? Television reports? Dr. Lamoureux fails to establish any basis for a conclusion so important to his testimony.  He also fails to discuss and quantify the phrase "particularly re-energized" or theoretically connect this concept with a likelihood of confusion in the marketplace.  Have words bearing an association to patriotism become so "re-energized" that customers are not able to "meaningfully distinguish" between them? *Id.* Without data, process, theory, or any other testable methodology, expert testimony does not fall within the admissibility standards of <u>Daubert</u>.

The utter absence of a reliable theory is highlighted by Dr. Lamoureux's inability to express a theory or explain the procedure by which he could evaluate whether the words "freedom," "America," "liberty," and "patriot" fall under the same metaphorical umbrella of "patriotism" that also covers the terms "flag," "free," and "star". Lamoureux Dep. at 112-120 (Q:

"Does patriot have a nationalistic or patriotic connotation to you?"  A: "I don't have a professional opinion. I haven't studied it"). When questioned about his preparation process, Dr. Lamoureux stated that he was given the parties' names and subsequently "formulated sort of a plan of attack as to how I would work this out if I was going to make the argument". Lamoureux Dep. 111.  Preparation by an expert which involves beginning with a goal (finding a similarity between the marks) and working backwards to meet the goal (evaluating only the given words, looking for a link) is the antithesis of reliable and scientific. *See* Castellow v. Chevron USA, 97 F.Supp.2d 780 (S.D.Tex. 2000) (excluding expert testimony due to unreliable methodology which was "result-driven" and "anathema to both science and law").

In addition to a reliability inquiry, the court must evaluate the relevancy of the proffered testimony.  Dr. Lamoureux's general expertise in the field of rhetorical criticism is relevant to a discussion of similarities in meanings between two words.  However, expert testimony is unnecessary, and may be excluded at the trial judge's discretion, if

> "…all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation." Mercado v. Ahmed, 974 F.2d 863, 870 (7th Cir. 1992) (quoting Salem v. United States Lines Co., 370 U.S. 31, 35 (1962)).

In light of these standards, it is clear that the two page report submitted by Dr. Lamoureux is not particularly helpful because the trier of fact is able to draw upon his/her own understanding and evaluate the meanings of the words included in the parties' marks.  First, the array of meanings and associations ascribable to the words "flag," "free," and "star" are easily discernable to "men of common understanding".  When presented with the parties' marks, the average person is capable of concluding that all three words share a patriotic connotation.  A person of average intelligence knows that the American flag features stars in the upper left

corner and symbolizes, among many other concepts, the "Land of the Free".  Conversely, the common juror is also capable of discerning the differences in meaning and association between the three words.   A juror could conclude that a consumer hearing the word "star" would immediately think of outer space or a celebrity before thinking of the shape.  It is entirely reasonable and conceivable, possibly even likely, that consumers could primarily associate the word "free" with an item or service requiring no payment.  Considering the immense popularity of American football among American citizens, a group of people brainstorming the meanings of these words could correctly note that a "flag" is also the yellow piece of cloth thrown during a football game after a penalty occurs on the field.  Men of common understanding do not need assistance in comparing the similarities and differences of common English words such as "flag," "free" or "star".  They need help in determining how the similarities of these words lead to confusion, or conversely, how the differences among the words may negate the likelihood of confusion. *See* Patsy's Italian Restaurant, Inc. v. Banas, 531 F.Supp.2d 483, 485 (E.D.N.Y. 2008) (excluding expert testimony where the party has failed to show why the testimony would aid the jury on the likelihood of confusion question).

Lamoureux offers no reasoning, theory, or technique to aid the trier of fact in determining whether consumers are likely to link "flag," "free," and "star" to patriotism as opposed to the other associations listed above.  Further, he offers no reasoning, theory, or technique to aid the trier of fact in assessing whether the patriotism associations are *confusingly* similar, as opposed to merely "similar".  Thus, Dr. Lamoureux's expert report offers no help to the trier of fact, beyond their own comprehension abilities, in determining the degree of similarity between the marks and whether that level of similarity will likely lead consumers to be confused.  Accordingly, the Motion to Strike is granted.

## II.  Dr. Ronald R. Butters

As the Court has determined that the expert report of Dr. Butters is not essential to ruling on the present Motions for Summary Judgment, the Court need not address the merits of Plaintiff's Motion to Strike.  The Motion is therefore moot.

### CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record of affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324.  In other words, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  Nevertheless, this Court must "view the record and all references drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co.,

883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

### I.  Standing to Sue

Freestar begins its challenge by asserting that Flagstar does not have constitutional standing to bring this lawsuit because it has not suffered an "injury in fact" which is "actual or imminent, not conjectural or hypothetical". Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  This argument has no merit because Flagstar clearly asserts "an invasion of a legally protected interest". Id.  Under Section 32(1) of the Lanham Act, a trademark "registrant" has standing to bring a lawsuit against "any person" who allegedly used an unauthorized "reproduction, counterfeit, copy, or colorable imitation" of the registrant's mark in commerce. 15 U.S.C. § 1114(1); See 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:3 (4th ed. 2009) ("if plaintiff is the owner of a federal mark registration, it may sue in federal court for infringement of that registered mark"). Flagstar is the undisputed owner of U.S. Trademark Registration No. 2,015,295, Registration No. 2,123,471, Registration No. 3,188,184, and Registration No. 3,593,602 and asserts that the continued use of Freestar's mark violates its rights under the Lanham Act and will cause harm to the value of its registered marks.  This allegation represents an injury in fact as defined in Lujan, and Freestar's argument to the contrary is unavailing.

### II.  Likelihood of Confusion

A plaintiff may recover for trademark infringement under the Lanham Act by establishing that (1) its mark is protectable and (2) a junior mark creates a likelihood of confusion in the minds of consumers. Eli Lilly & Co. v. Natural Answers Inc., 233 F.3d 456, 461

(7th Cir. 2000).  The first element of this inquiry, whether Flagstar's registered marks fall within the protection of the Lanham Act, is not at issue here as the Defendant has not challenged the validity of Plaintiff's registered trademarks or the right of the Plaintiff to use the marks.  Thus, the only element at issue is the likelihood of confusion.  The likelihood of confusion element is also necessary to prove the claims contained in Counts II and III of the Complaint. Rust Environment & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1214 (7th Cir. 1997); AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 615 (7th Cir. 1993); Spraying Systems Co. v. Delavan, Inc., 975 F.2d 387, 392 (7th Cir. 1992).[1]  As a result, the only question now before the court is whether the evidence submitted on the likelihood of confusion issue is "so one-sided that there can be no doubt about how the question should be answered". Packman v. Chicago Tribune Co., 267 F.3d 628, 637 (7th Cir. 2001) (quoting Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 171 (7th Cir. 1996)).

To determine whether a likelihood of confusion exists, the court must analyze the following seven factors:  (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. Autozone, Inc. v. Strick, 543 F.3d 923, 929 (7th Cir. 2008).  The court may apply varying weight to each of these factors depending on the facts of the case; however, the similarity of the marks, defendant's intent, and actual confusion are of particular importance.  See Barbecue Marx, Inc. v. Ogden, Inc., 235 F.3d 1041, 1044 (7th Cir. 2000); Eli Lilly 233 F.3d at 461.

---

[1] Both parties acknowledge that the likelihood of confusion analysis applies to all claims contained within the Complaint.  See R. 39 at 25; R. 58 at 36.

a. **Similarity of the marks**

When determining whether two marks are confusingly similar, the court should consider the marks as a whole. <u>Autozone</u>, 543 F.3d at 929.  The court must evaluate the marks "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side". <u>Sullivan v. CBS Corp.</u>, 385 F.3d 772, 777 (7th Cir. 2004) (citation omitted).  The question to be addressed is "not whether the public would confuse the *marks*, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected". <u>Autozone</u>, 543 F.3d at 930 *(*quoting <u>James Burrough Ltd. V. Sign of Beefeater, Inc.</u>, 540 F.2d 266, 275 (7th Cir. 1976))*.*  Stated more simply, the court should consider whether the similarity of the marks would lead a customer to believe that the trademark owner "sponsored, endorsed, or was otherwise affiliated with the [Defendant's] product".  <u>Autozone</u>, 543 F.3d at 930 (quoting <u>Nike, Inc. v. "Just Did It" Enters.</u>, 6 F.3d 1225, 1228-1229 (7th Cir. 1993))*.*

Flagstar asserts that four registered marks, each containing the word "Flagstar" are infringed upon by Defendant's mark, which contains the word "Freestar".  As a result, the similarities and differences between the words "Flagstar" and "Freestar" are applicable to all of the marks.  To begin, both are two-syllable compound words beginning with the letter "F" and ending with the word "Star".  Each word contains eight letters, the second letter a consonant and the third a vowel. However, the first word of each mark is distinctly different:  "flag" and "free".  Beyond the first letter, each word bears a distinct sound, utilizing different vowels (an "a" verses "e"), a different compound ("fl" verses "fr"), and a different ending ("ag" versus "ee").

Courts, however, must move beyond a side-by-side comparison of minor details when considering the similarity of the marks.   Accordingly, each of the following Flagstar marks will be compared to the Freestar mark based on overall impression.

> **i.    U.S. Trademark Registration No. 2,015,295**



The similarities between the two marks shown above are few. Plaintiff's mark is not formatted and includes no colors or graphics.  Defendant's mark includes italicized letters, identifies the registrant as a bank, and includes the four word slogan:  "Life keeps getting better!".  Further, the "A" in "star" is the color green, with a star-shape graphic in the center of the letter.  The points of the star extend into the "T" and "R" in the word "star," invoking the imagery of a shooting star.

A consumer looking at these two marks could not be reasonably confused as to their source.  A reasonable person, based on the lack of similarity between these marks, would have no reason to believe that Flagstar sponsored the services being marketed by the owner of Defendant's mark.  When taken as a whole, a genuine issue of material fact concerning whether or not these marks are confusingly similar simply does not exist.

> **ii.    U.S. Trademark Registration No. 3,593,602**





The two marks above bear some similarities, but are not confusingly similar.  Both marks include words italicized in the same direction.  They also include a reference to the nature of their business: banking, as well as slogans located under the name of the bank.

In Flagstar's mark, the first letter of the word "Flagstar" is capitalized, followed by lower-case lettering.  The slogan, "The new wave in banking," is located below the name, with a graphic comprised of two thick, black, curved lines underneath it.  This graphic implies the waves of a flag. Joyce Dep. pg 24.

Freestar's mark is comprised of all capital lettering.  It includes the word "Bank" on the lower right of the mark below the word "Star". The slogan, "Life keeps getting better!", is included on the third line of the mark.   Finally, the mark includes the color green and has a star-shaped graphic on the "A" in "star".

The slogans included in each of the marks are very distinct and do not utilize any of the same words.  Flagstar's slogan is a statement describing the innovative nature of Flagstar's services.  In contrast, Freestar's slogan is an exclamatory quotation intended to focus the reader on himself and the nature of life with Freestar as his banking provider.

The differences between these marks are not "minor stylistic differences" between two marks with identical names.  Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997). The marks at issue feature completely different graphics (two black curved bars and a star), slogans which differ in both content and function, and different color-schemes. When considered as a whole, these marks are clearly indicative of two separate entities and pose no likelihood of confusion.

### iii.    U.S. Trademark Registration No. 3,188,184





15

The similarities between the marks above would not lead a consumer to become confused about the origin of defendant's mark.  Both marks include the word "Bank" in the bottom right corner of the mark and feature italicized lettering.  However, the graphics are different and unrelated (two thick, black, wavy lines in Flagstar's mark as opposed to a shooting star in Freestar's mark), the capitalization of the words is different, and Freestar's mark includes its slogan along with the color green.

Flagstar submitted photographs of its mark as it appears in the marketplace.  As shown below, Flagstar's mark prominently features the color red when displayed in the marketplace.  Freestar's pending registration for its mark singles out the colors black, green, and white as a feature of the mark.  When the marks are considered as a whole, the colors featured on each mark, coupled with the graphical differences in their representation, the differences in name, and Freestar's slogan, overcome the minimal similarities of the marks and render them clearly distinguishable in the marketplace.





  iv.  **U.S. Trademark Registration No. 2,123,471, ("Legacy mark")**



   Of the four marks at issue, the Plaintiff's "Legacy mark," displayed below, bears the most similarity with Freestar's mark. The visual similarities between these two marks include: italicized lettering, capital letters for all words, the word "Bank" on the lower right of the mark, and a star graphic in the middle of the letter "A" in "Star". The differences include: the "wave" graphic in Flagstar's mark, the presence of Freestar's slogan in its mark, and Freestar's use of a "shooting" star as its graphic.

   As discussed in the section above, Flagstar's use of its marks in the marketplace features the color red prominently while Freestar employs a consistent use of black and green. The marks, as used in the marketplace are displayed below:







Once again, Freestar's mark is clearly distinguishable from Flagstar's mark as it appears in the marketplace despite the similarities of the marks when compared side-by-side. The similarities between these two marks would not lead a reasonable fact finder to conclude that consumers would attribute these marks to the same source. A customer is not likely to be confused between the origin of marks with different names and completely different colors and slogans. Further, the graphics of the marks evoke different imagery: a waving flag as opposed to a shooting star. When considered holistically and as used in the marketplace, reasonable minds can reach only one conclusion: that these marks are indicative of completely separate, but possibly competing, entities.

### b. Intent to "palm off"

The record contains no evidence pertaining to Freestar's intent to "pass off [its] products as having come from the plaintiff". Packman 267 F.3d at 644 (quoting Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 940 (7th Cir.1986)). However, Flagstar nevertheless contends that if Freestar acted with due diligence during its rebranding process, it would have discovered the existence of the Flagstar marks. Flagstar also points out that its registrations are constructive notice to any subsequent registrant of Flagstar's prior rights and registrations of its marks under 15 U.S.C. § 1072. Defendant has denied any prior, actual knowledge of Flagstar's marks. However, even if Freestar had prior actual or constructive knowledge of the Flagstar marks, the legal weight of this issue is negligible in this instance because actual knowledge alone is not enough to prove intent. Barbecue Marx, 235 F.3d at 1046.

Flagstar relies on *Autozone* in urging the Court to infer intent based on the similarities of the marks. However, the *Autozone* ruling is clear that intent can be inferred based on similar marks only where "the senior mark has attained great notoriety" and is "nearly ubiquitous in the

geographic area where the junior mark competes". <u>Autozone</u>, 543 F.3d at 934.  Flagstar operates

no banking centers or home loan centers in the three counties where Freestar exclusively

operates and advertises.  Additionally, Flagstar has submitted no evidence regarding either a

marketing or a business presence in the geographic area where the junior mark competes.  As a

result, the Court cannot infer intent based on either the facts of this case or the evidence in the

record.

### c.  Actual confusion

Evidence of actual confusion is not required to prove that a likelihood of confusion

exists. <u>CAE, Inc. v. Clean Air Engineering, Inc.</u>, 267 F.3d 660, 685 (7th Cir. 2001); <u>Barbecue

Marx</u>, 235 F.3d at 465.  However, in the interest of thoroughness, the Court notes the complete

absence of evidence related to any actual consumer confusion between any of Flagstar's marks

and Freestar's mark.

### d.  Area and manner of concurrent use

When evaluating this element, the Court must determine "whether there is a relationship

in use, promotion, distribution, or sales between the goods or services of the parties". <u>Ty, Inc. v.

Jones Group, Inc.</u>, 237 F.3d 891, 900 (7th Cir. 2001) *quoting* <u>Forum Corp. of North America v.

Forum, Ltd.</u>, 903 F.2d 434, 442 (7th Cir.1990).   Primary considerations include: geographic

overlap, *see* <u>Autozone</u>, 543 F.3d at 932; direct competition between the products, *see* <u>Smith

Fiberglass Prods., Inc. v. Ameron, Inc.</u>, 7 F.3d 1327, 1330 (7th Cir. 1993); and the use of the

same marketing channels, *see* <u>Nike, Inc.</u>,  6 F.3d at 1230.  The undisputed facts of this case,

along with evidence submitted by both parties, clearly show that Flagstar and Freestar's services

are not utilized concurrently in any area or manner.

To begin, the parties' geographic markets do not overlap.  Freestar's banks are located exclusively within three Central Illinois counties:  Champaign county, Livingston county, and McLean county.  Flagstar operates no banking or home loan centers in these counties. Similarly, Freestar operates no banking centers in Flagstar's primary areas of operation:  Michigan, Indiana, and Georgia. The disparate geographic presence of the parties weighs against finding an overlap in consumer base. An Illinois consumer seeking to open a bank account would need to drive across state lines before encountering a Flagstar banking center.  A person seeking a home loan cannot "cruise down the street" and become confused by the presence of a Flagstar home loan center and a Freestar banking center because he or she will not encounter both of these entities within the same *county*, let alone city. *Compare* Autozone, 543 F.3d at 930 (where both parties sold and promoted their goods and services in the Chicago area, one mile separated the parties' businesses, and a consumer "cruising down the street… after driving past both parties' businesses" could believe the parties' businesses were affiliated). How can customers be confused by marks which they do not encounter during their everyday lives, and conceivably, do not even know exist?

Further, Flagstar has presented no evidence that remotely suggests an expansion into Champaign, Livingston, and McLean counties is reasonably expected.  On the contrary, Flagstar stated in SEC filings for the 2007 fiscal year that the company's "expansion strategy consists principally of adding new bank locations in Michigan and Georgia growth areas". R. 58, Exhibit to Defendant's Motion for Summary Judgment at App 000221. Flagstar has not submitted any business plans, emails, internal memoranda, or deposition testimony to support a finding that Flagstar is reasonably expecting to enter into the Illinois banking landscape or expecting to open home loan centers in Champaign, Livingston, or McLean counties. The record is devoid of

evidence of any link between these two businesses beyond the hypothetical possibility that Flagstar may open a branch somewhere in the state of Illinois one day.  The Plaintiff must submit evidence beyond speculation if it expects to survive summary judgment, and no such evidence of any concurrent use exists here.  Nor has Flagstar presented any evidence of direct competition between the products or an overlap in the consumer base.

Finally, Flagstar has offered no evidence of overlapping marketing channels.  Freestar limits its advertising to the local radio stations, television advertisements, newspapers, and billboards which serve the three-county Central Illinois area in which it operates. Vogelsinger Aff. ¶ 20. Flagstar has offered no evidence proving that it markets its services via the same Central Illinois channels. Flagstar points to the presence of five home loan centers located in Illinois as evidence that it advertises in the same area as Freestar.  However, Flagstar does not assert, and offers no evidence establishing, that it advertises in Champaign, Livingston or McLean counties, while Freestar limits its advertising solely to these three counties. Additionally, Flagstar's corporate model allows the centers to devise their own marketing plan. As a result, Flagstar is unable to confirm that these home loan centers actually use the Flagstar advertising materials given to them to advertise the Flagstar name within the state of Illinois. Flagstar includes screenshots of both parties' websites in an effort to show that both parties utilize the internet as a marketing channel.   However, Flagstar has presented no authority stating that the maintenance of two independent websites, which are not linked in any way,[2] constitutes an overlapping marketing channel for purposes of this discussion. In sum, the record contains no evidence showing that the companies have marketed and sold their goods or services to the same customers, CAE, 267 F.3d at 682; advertized in similar magazines, Ty, Inc., 237 F.3d at 901;

---

[2] *Compare*  Eli Lilly, 233 F.3d at 460 (where Defendant intentionally used Plaintiff's mark as a metatag on its website, resulting in the diversion of people searching for Plaintiff's mark to Defendant's website)

marketed their goods and services concurrently via the same websites, *Id.* at 901; or intentionally linked otherwise independent websites, <u>Eli Lilly</u>, 233 F.3d at 460.

The parties do not operate businesses which overlap in geographic location. Additionally, Flagstar has offered no evidence showing that both parties use the same marketing channels or that the products and services offered by these companies serve the same consumers, or that the parties are in direct competition. As a result, no genuine issue of fact exists as to whether a likelihood of confusion will arise on this element.

### e. Degree of care exercised by consumers

When the products and services offered by the parties are widely accessible and inexpensive, consumers will likely exercise "a lesser degree of care and discrimination in their purchases" <u>Autozone</u>, 543 F.3d at 933 (quoting <u>CAE, Inc.</u>, 267 F.3d at 683). The products and services offered by banks are widely accessible; however, banking customers engage in a profoundly different process than consumers of other widely accessible products such as cans of cooking spray in the grocery aisle[3] or oil change services.[4] Potential Flagstar customers must submit to credit checks before they are able to open a new bank account and must submit to intrusive questioning about personal finances as a part of the home loan process. Freestar Bank requires prospective customers to speak with a bank loan officer before obtaining a home loan. The services offered by the parties' banks subject prospective customers to invasive and prolonged inquiries before the services are rendered. Customers do not carelessly sign themselves up for such investigative procedures, indicating that banking customers exercise an elevated degree of care.

---

[3] <u>AHP</u>, 1 F.3d at 616-617.
[4] <u>Autozone</u>, 543 F.3d at 931-932.

Flagstar relies on the testimony of Freestar's designated representative, who stated that customers vary in their degree of care, in its effort to show that a genuine issue of fact exists. However, this testimony is mere speculation, the kind of "metaphysical doubt" which does not survive the summary judgment analysis. <u>Matsushita</u>, 475 U.S. at 586. Flagstar has offered no evidence justifying its assertion that banking customers are likely to be confused because they generally lack sophistication. Thus, a genuine issue of fact beyond mere speculation does not exist on the degree of care element.

Flagstar also points the Court's attention to two sub-issues in the degree of care analysis, arguing that, even if banking customers are sophisticated and discerning, they are susceptible to initial interest confusion and reverse confusion resulting from the simultaneous use of the parties' marks. Initial interest confusion occurs when a consumer is "lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated". <u>Promatek Industries, Ltd. v. Equitrac Corp.</u>, 300 F.3d 808, 812 (7th Cir. 2002). In <u>Promatek</u>, the defendant used the plaintiff's mark as a metatag on its website, directly linking defendant's website to plaintiff's mark. As a result, when consumers entered plaintiff's mark into a search engine, defendant's website would appear. Here, the evidence on record offers no proof that Freestar lured Flagstar's consumers to its products or website in any way or that consumers will patronize a Freestar bank because they perceive the name to be linked with Flagstar bank. Flagstar has only offered its own self-serving speculation on this matter, which is plainly insufficient to survive summary judgment.

Reverse confusion occurs when "a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user". <u>Sands, Taylor & Wood Co. v. Quaker Oats Co.</u>, 978 F.2d 947, 957 (7th Cir. 1992). As a result, consumers may begin to see the senior user as

the infringer.  This scenario is most likely if "the senior user were to attempt to expand into the precise field where the junior user has created a strong association between *its* product and the senior user's mark".  <u>Sands</u>, 978 F.2d at 958.   The facts presented in this case simply do not support a finding of reverse confusion.  Neither party asserts that Freestar, which in our case is clearly a small bank, has saturated the Central Illinois banking market. Additionally, the record is barren of evidence proving that Flagstar's expansion into Central Illinois would be hampered because Freestar has created a "strong association" between its product and the Flagstar mark. Reverse confusion does not apply to this case.

### f.  Strength of the plaintiff's mark

The Court assesses "strength" by evaluating the overall economic and marketing strength of Plaintiff's mark. <u>Autozone</u>, 543 F.3d at 933. Economic and marketing strength is measured by "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular…source". <u>Eli Lilly</u>, 233 F.3d at 464 (citations omitted). The only ways to directly prove the public's evaluation of a mark are via customer testimony and consumer surveys. <u>Gimix Inc. v. JS & A Group Inc.</u>, 699 F.2d 901, 907 (7th Cir. 1983). However, evidence of the frequency of a mark's display and the amount of advertising dollars used to promote the mark are relevant factors when determining a mark's strength. *See* <u>Autozone</u>, 543 F.3d at 933.

Flagstar displays its marks in 175 banking centers in Michigan, Indiana, and Georgia and spent $12.3 million in advertising in 2008. These numbers are not indicative of a mark bearing enormous economic and marketing strength nationwide. *Compare* <u>Autozone</u>, 543 F.3d at 933 (citing the mark's display in over 3,000 stores nationwide and use in "hundreds of millions of dollars worth of advertising" as indicators of national economic and marketing strength).

25

Additionally, Flagstar cannot verify that its marks have any economic or marketing strength outside of the three states which house its banking centers because it has no knowledge of how the home loan centers advertise.   Obtaining even a small piece of evidence regarding advertising in Illinois would have been simple, yet Flagstar filed for summary judgment before placing a single call to one of its five Illinois home loan centers in order to find out if and when it has used Flagstar materials in advertising. Coupled with Flagstar's absence from the Central Illinois marketplace where Freestar does business, the record is clear: Flagstar has not met its burden to produce actual facts and evidence beyond speculation and argument which raise a genuine issue of fact regarding the strength of its mark.  A mark cannot bear economic and marketing strength in a place where it does not do business and does not advertise.

### g.  Similarity of the products

The parties do not dispute the identical nature of their products and services. Both parties are banks.  In the areas where they have banking centers, they offer the same products and services, including personal and business savings accounts, personal and business checking accounts, money market accounts, certificates of deposit, home mortgage loans, home equity lines of credit, online banking and online mortgage applications.  Although Defendant notes that the products and services offered in Illinois are not identical, as Plaintiff offers only home loan-related services rather than full service banking centers, any further discussion of this point conflates similarity of the products with area and manner of concurrent use.

No issue of fact exists as to the similarity of the products offered by the parties, a factor which weighs in favor of Flagstar.

### III.   Weighing the factors

Although no single factor of the seven-part likelihood of confusion test is dispositive, the 7th Circuit has acknowledged that the similarity of the marks, intent to palm off and actual confusion are generally important factors. Autozone, 543 F.3d at 929.  Nevertheless, courts "may assign varying weights to each of the factors depending on the facts presented". Packman, 267 F.3d at 643. The facts and evidence presented by the parties show that Flagstar and Freestar's products and services, although identical, are not offered concurrently in any area of this country, nor are they marketed to an overlapping consumer base.  This fact clearly distinguishes this case from the preeminent 7th Circuit decisions relied upon by the parties and warrants weighing the area and manner of concurrent use element heavily. Consumers cannot become confused by a mark they will never encounter in the marketplace.

Although Flagstar's "Legacy mark", in particular, and Freestar's mark bear many similarities when compared side-by-side, a reasonable fact-finder comparing the marks as a whole could not conclude that these similarities will lead to customer confusion as to the marks' origin or affiliation. The other identified marks bear no significant similarity and could create no likelihood of confusion. Even if reasonable fact-finders could disagree over confusion resultant from the similarities of the marks, the record is still extremely one-sided when the other Autozone factors are also considered. Flagstar has presented no evidence confirming that these two marks are used in the same *state*, let alone county, city, neighborhood or street.  Flagstar has also submitted no evidence of imminent expansion into the counties where Freestar exclusively operates. The absence of any concurrent or overlapping distribution and marketing of services negates the relevance of the parties' identical services for purpose of the likelihood of confusion analysis.

Concerning the strength of the Plaintiff's mark, reasonable minds could not consider a $12.5 million advertising expenditure for 2008 to be evidence of a strong mark when Flagstar has presented no evidence that a single dollar of that amount was directed toward Illinois. Neither party has submitted strong evidence of customer sophistication beyond speculation. However, because the parties submit prospective customers to credit checks and interviews, the evidence on the record favors considering banking customers sophisticated for purposes of this analysis. Finally, the record contains no evidence of actual confusion or Freestar's intent to palm off its product as being associated with Flagstar's.

In order to resolve cross Motions for Summary Judgment, the court must evaluate the undisputed facts and evidence submitted to determine whether a genuine issue of material fact exists. Concerning whether Freestar's use of its mark creates a likelihood of confusion with Flagstar's registered marks, no such issue exists.  Accordingly, because no reasonable trier of fact could find in favor of Flagstar on this issue, Freestar is therefore entitled to judgment as a matter of law.  Flagstar's request for summary judgment is therefore denied.

## CONCLUSION

For the foregoing reasons, Flagstar's Motion [#38] is DENIED. Defendant's Motion to Strike [#49] is GRANTED, and Plaintiff's Motion to Strike [#59] is MOOT. Freestar's Motion for Summary Judgment [#57] is GRANTED. This matter is now TERMINATED. All deadlines are vacated, and all other pending motions are MOOT.

ENTERED this 13 day of November, 2009.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge